UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DAVID R. MAYNE | CIVIL ACTION |
| VERSUS | NO. 07-4210 |
| OMEGA PROTEIN, INC., ET AL. | SECTION "L" (3) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I. PROCEDURAL HISTORY

David R. Mayne was employed by Omega Protein, Inc., as a member of the crew of its commercial fishing vessel, the F/V COTE BLANCHE BAY. On July 2, 2007, while performing his duties, Mr. Mayne was struck in the face by a large steel ring attached to a fishing net, causing him to sustain injuries and other damages. He filed suit under the Jones Act and General Maritime Law against his employer, Omega, and the vessel, F/V COTE BLANCHE BAY, claiming his injuries and resulting damages were caused by the negligence of his fellow employees and the unseaworthiness of the vessel. The plaintiff also seeks maintenance and cure and attorney's fees for failure to timely pay these benefits. The defendants deny that the incident on July 2, 2007, was caused by any malfunction of the vessel's equipment or any negligence of Omega or its other employees. Instead, the defendants assert that the plaintiff's injuries were caused by his own inattention to duty and his failure to use his prior training and experience in performing his job duties. The defendants also question the nature and extent of the plaintiff's injuries and his right to past maintenance and cure and attorney's fees.

This matter came on for a bench trial on February 19, 2009. After considering the testimony and exhibits presented at trial, the Court now makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure. To the

extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. And to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts it as such.

## II. FINDINGS OF FACT

1.

Plaintiff, David R. Mayne, is an individual of the age of majority and a resident of the State of Louisiana, Parish of Acadia.

2.

Defendant, Omega Protein, Inc., ("Omega") is the owner of the F/V COTE BLANCHE BAY, a menhaden or pogy fishing vessel which was bringing in a fish catch at the time of the plaintiff's accident.

3.

At all relevant times, the plaintiff was employed by defendant, Omega, as a seaman or a member of the crew of the F/V COTE BLANCHE BAY in the capacity of a pogy fisherman. He has worked for Omega in this capacity for about 20 years. The plaintiff's job duties required a significant amount of bending, lifting, and climbing, and can best be described as heavy manual labor.

4.

The F/V COTE BLANCHE BAY is equipped with two purse boats which assist in positioning the net used to catch and bring in the fish haul. The net has large metal rings on the bottom and floats on the top. The floats keep the top of the net floating and the rings cause the bottom to sink and also to allow the bottom to be closed with a draw string which is threaded through the rings. To bring in the fish catch, the bottom of the net is closed by tightening the

draw string and lifting the net with winches which are located on the COTE BLANCHE BAY. While this is being done, a member of the crew stands on a platform located on the purse boat and gathers the top portion of the net and secures it with a tying device to position the catch in the center of the net so that the fish can be more easily removed.

5.

At the time of the accident, the COTE BLANCHE BAY was located at the stern of the purse boats and the Captain, Lawson Schools, was operating the winches or hardening rig. The plaintiff was on one of the purse boats standing on the platform so that he could gather and tie off the top of the net. He was in full view of the captain. As the captain was closing the bottom and pulling in the net, a ring attached to the net fell towards the deck and became caught in a gap between a step and the platform on the purse boat where the plaintiff was standing. Despite the ring being caught, the captain continued to apply pressure and tension through the hardening rig. When enough tension was applied, the ring jumped out of the gap it was stuck in, flew through the air, and hit the plaintiff solidly in the face at a very high speed. The ring is made of steel and weighs about two pounds.

6.

It is not unusual for the metal rings to come in contact with the deck or equipment on the deck during this operation. On other occasions, rings have become stuck during the operation of closing and pulling up the net. Although a ring had never gotten stuck in this exact gap on previous occasions, it was clearly foreseeable that it could. With the knowledge that the rings often come into contact with the deck during the normal course of operations, it would have been a reasonable precautionary measure to close any gap in the vicinity of where crew members had to stand while performing this task. It was certainly feasible to close the gap and avoid the

opportunity of this very thing from happening.  In fact, after this incident, the gap in question was indeed closed by welding a small piece of metal over it, which proves the feasibility of this precautionary measure.  The captain testified that the plaintiff, at the time he was injured, was standing where he was supposed to be standing, doing what he should have been doing, and did not contribute in any way to his injury.

7.

The blow to the plaintiff's face caused multiple fractures to his face and skull.  His wounds were open and he lost a considerable amount of blood.  It is not clear from the evidence whether the plaintiff was rendered totally unconscious, but it is clear that he was, at least, severely disoriented and dazed.  He was brought to shore by boat and was picked up at the dock by Acadian Ambulance Service.  He was then taken to Lafayette General Medical Center, where he was examined by Dr. Rouchelle Duplechian.  Dr. Duplechian obtained a CT scan which revealed fractures involving the interior aspect of the frontal sinuses, including the medial walls of the orbit and nasal septum and the upper aspect of the nasal bone.  Dr. Duplechian sutured the wounds and then called Dr. Robin Barry, an otorhinolaryngologist who examined the plaintiff and sutured the rest of the area.

8.

On July 5, 2007, Dr. Barry obtained another CT scan at Lafayette Surgical Speciality Hospital.  This scan confirmed multiple fractures of the right nasal bone and the outer table of the skull over the frontal sinus with moderate increased density within the sinuses, suggestive of either sinus contusion or superimposed sinusitis.  The results also confirmed fractures to the medial wall of the frontal sinuses in the region of the orbits.  Dr. Barry was able to clinically correlate these findings through his physical examination.  He had a direct view of the fracture

and could feel the damaged area.

9.

On July 11, 2007, Dr. Barry took the plaintiff to surgery and performed an open reduction with internal fixation of the anterior table of his frontal sinus, and a closed reduction of his nasal fractures and endoscopic removal of the damage of the intrasinus septum and frontal sinus. In that procedure, his first step was to remove the sutures and open up the wounds that had been sutured in the previous procedure. This gave Dr. Barry a view of the sinus. He was able to pry up one of the bones of the frontal sinus that was depressed so that he could actually look inside the sinus. At that point, Dr. Barry removed some of the bone to look inside the wound through an endoscope. He then removed any boney fragments that were visible and used a small drill to remove some of the wall that separated the right side from the left side to assist with drainage. Dr. Barry next removed bone from the sinus septum and repositioned it, holding it down with a metal plate. Finally, Dr. Barry performed a closed reduction of the nasal fracture. To accomplish this, he palpated the nasal fractures to determine how far the displacement had gone. He then put an elevating instrument inside the nostril and used it to push until the bone was maneuvered back into position.

10.

On July 24, 2007, thirteen days after his surgery, the plaintiff returned to Dr. Barry to complain of headaches and sensitivity to light. Dr. Barry requested an additional CT scan. From an ENT standpoint, Dr. Barry did not have any explanation for the plaintiff's headaches and suggested a referral to another specialist.

11.

On August 10, 2007, the plaintiff was examined by Dr. Fayez Shamieh, a neurologist in

Lake Charles, Louisiana. Dr. Shamieh noted that the plaintiff's initial symptoms included dizziness, blurred vision, and some memory problems. He concluded that these symptoms were consistent with someone who suffered a severe trauma or a blow to the head. Dr. Shamieh related these symptoms to the incident of July 2, 2007. He has continued to treat the plaintiff for recurring headaches.

12.

After the pain in his face and head began to somewhat subside, the plaintiff began to complain of neck pain. He returned to Dr. Shamieh and an MRI of the cervical spine was performed. After Dr. Shamieh reviewed the results of the MRI, the plaintiff was referred to Dr. Clark Gunderson, an orthopedic surgeon, for further treatment.

13.

After reviewing the MRI and examining the plaintiff, Dr. Gunderson diagnosed the plaintiff as suffering from a ruptured disc with an extruded fragment at C-5, with what was described by the radiologist as severe central stenosis or narrowing. In addition, the plaintiff had some narrowing of the foramen at C5-6. Based on these findings, along with the plaintiff's continued neck and left arm pain, tenderness, limited motion, and decreased sensation of the C-6 dermatome, Dr. Gunderson recommended that the plaintiff be admitted to the hospital for a cervical myelogram, and enhanced CT scan and EMG of his left arm. The myelogram and enhanced CT scan showed a central disc herniation at C5-6 with a central canal stenosis. At C-4-5, there was a large broad-based central disc herniation with generalized impingement on the spinal cord and there was a smaller disc herniation at C3-4. Dr. Gunderson also had an EMG performed by Dr. Shamieh that demonstrated C5 and C6 nerve root lesions on the left side as well as left carpal tunnel syndrome. Based upon his examination of the patient and review of the

diagnostic tests, Dr. Gunderson concluded there were significant herniations at C4-5 and C5-6 with radiculopathy at C5 and C6 and recommended a two-level anterior discectomy and fusion with anterior plate and external bone graft. The cost of this surgery is estimated at $75,000.

14.

On September 17, 2006, some ten months prior to his injury which is the subject matter of this lawsuit, the plaintiff was involved in a car accident and injured his neck, back, and right shoulder. An MRI indicated some protrusion of the disc at the C4-5 level. The plaintiff remained under conservative care until September 25, 2006, at which time he returned to work and was free of pain. He had been working and performing his regular activities as a fisher with Omega without any pain or difficulty until his injury on July 2, 2007. Since the July injury, the plaintiff has been in pain and disabled from any gainful activity. Dr. Gunderson is of the opinion that, to a reasonable degree of medical certainty, the injury sustained on July 2, 2007 aggravated the pre-existing condition and caused his present neck pain, symptoms, and disability.

15.

In addition to pain in the cervical region, the plaintiff complained of headaches and problems with breathing from one side of his nose. On July 30, 2008, the plaintiff was examined by Dr. Darrell L. Henderson, a plastic surgeon. Dr Henderson found that the plaintiff had some severe lacerations with considerable distortion at the bridge of the nose between the eyes. The plaintiff's lacerations extended from the base of the nose up into the right eyelid near the eyebrow, and then across to the outer aspect of the lower eyebrow through the eyes. In addition, an examination of the interior of the plaintiff's nose showed a very large spur in the septum that deviates to the left. The spur markedly interfered with the nasal airway. It appeared that the septum had been broken or crushed to the extent that it almost completely obstructed the left side

of the airway. X-rays confirmed the marked deviation of the nasal septum to the left. In particular, the lower aspect and the x-rays showed very large nasal turbinates, which are bone-like structures that grow on the side walls of the nose toward the inside of the nose. When a person has a major trauma, the turbinates tend to enlarge rapidly and further obstruct breathing. Based on his examination of the plaintiff, Dr. Henderson concluded that the plaintiff needs to have surgical excisions and revisions of the vertical nasal scar and the deformed scars of the upper eyelid. Dr. Henderson also recommended that the plaintiff have a secondary reduction of the nasal fractures and a straightening of the septum and removal of the long spur and a reduction of the turbinates. Accoding to Dr. Henderson, this procedure would help the plaintiff breathe better and would probably help improve some of the pain he has in the middle portion of his face.

16.

The plaintiff was evaluated by Lawrence Dilks, Ph.D, a neuropsychologist, in connection with his closed head injury. Dr. Dilks was recommended by the plaintiff's neurologist, Dr. Shamieh. After examining the plaintiff and performing a number of tests, Dr. Dilks concluded that the plaintiff suffered a cognitive impairment secondary to the July incident. Additionally, Dr. Dilks found that the plaintiff met the criteria for the diagnosis of depression, secondary to his cognitive impairment, and pain disorder, which was physiological and contained physiological features. One problem with the diagnosis of cognitive impairment is that the weight of the evidence indicates that the plaintiff was mentally challenged prior to the accident. His schooling has been very limited and consisted primarily of special education courses.

17.

Despite knowledge of the plaintiff's medical condition, it was not until January 8, 2009,

or only about one month before trial, that the defendant retained a physician to render an opinion on the need for cervical surgery. The defendant retained Dr. Thomas Bertuccini to review the medical records and examine the plaintiff. Dr. Bertuccini does not dispute that the plaintiff has several ruptured cervical discs, that he is likely in pain, and that, if the pain persists, an operation would be the preferred treatment. He compared the 2006 tests with the 2008 tests and found that both showed some abnormal disc involvement, suggesting that the plaintiff's injuries are attributable to an earlier trauma. Nevertheless, he also conceded that a subsequent injury can make a prior injury symptomatic. Although Dr. Bertuccini agrees that surgery may be necessary, he suggests that the plaintiff should try cervical left epidural steroid injections before that surgery. Notwithstanding that suggestion, the defendant has not authorized this treatment or any other treatment for the plaintiff.

18.

The plaintiff has not returned to work since his accident on July 2, 2007. His date of birth is September 24, 1959. At the time of trial, he was 50 years old. He has a verbal I.Q. of 57, a performance I.Q. of 54, and a full scale I.Q. of 51. He cannot read or write and has had limited formal schooling. He has worked for the defendant for 20 years doing heavy manual labor. A vocational rehabilitation evaluation was performed by Mr. Glenn Hebert, a licensed rehabilitation counselor. It is Mr. Hebert's opinion that the plaintiff suffered a loss of earning capacity since he is in pain and still under treatment and has not been released to return to any work. If the plaintiff is able to return to work, it will have to be light menial labor, most likely part time.

19.

The credible economic testimony supports the conclusion that the plaintiff was earning

about $25,000 per year in gross wages and had an additional work life expectancy of some 11 years. Deducting from his gross wage the appropriate state and federal taxes would give the plaintiff a past after-tax wage loss of $37,801.00 and a future loss after commuting to present value of $226,196.00.

### III. CONCLUSIONS OF LAW

1.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 688.

2.

The matters before this Court include determinations as to whether the Defendant Omega was negligent under the Jones Act, whether the vessel was unseaworthy under General Maritime Law, whether the Plaintiff is entitled to any maintenance and cure benefits above what he has already received, and whether the Plaintiff is entitled to attorney's fees due to the Defendant's failure to continue to pay maintenance and cure.

3.

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe, for the purposes for which it was intended to be used." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339, 75 S.Ct. 382, 99 L.Ed.354 (1955). "A vessel's condition of

unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500, 91 S.Ct. 514, 517-18, 27 L.Ed.2d 562 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972). The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

To recover damages for an unseaworthy condition, the plaintiff is required to establish that the unseaworthy condition was a proximate cause of the injury. *See Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir.1992) (quoting *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir.1988); 1 SCHOENBAUM, ADMIRALTY AND MARITIME LAW §6-25 (4th ed.).

The credible evidence supports the findings that the purse boat was not fit for its intended purpose. Omega breached its duty to provide the plaintiff with a safe place to work because in the area in which the plaintiff was assigned to work gathering the rings and arranging the net, there were numerous places where the rings were able to get stuck and hung up. However, there were no safety procedures in place to protect against such an incident. Crew members testified that rings had gotten stuck in the past, but the situation was never remedied or rectified. It was not until after the severe accident involving the plaintiff that the defendants finally undertook the basic safety precaution of welding a plate to close the dangerous gap on the vessel. The plaintiff's injury was proximately caused by the defective condition of the vessel. Accordingly,

the vessel was unseaworthy.

4.

"A seaman is entitled to recovery under the Jones Act ... if his employer's negligence is the cause, in whole or in part, of his injury." *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir.1997). An employer has the duty to provide his seaman employees with a reasonably safe place to work, including providing reasonably suitable gear. *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir.1989). A cause of action under the Jones Act arises when the employer's duty is breached and the breach brings about or actually causes the injury or damage, in whole or part. *See Gautreaux*, 107 F.3d at 335.

In this case, the defendant breached its duty under the Jones Act and that breach was a cause of the seaman's injury. At all times, the captain was in control of the winch, or hardening rig, and the operations involving raising the net. He controlled the amount of tension placed on the net and had full view of all operations. He was also aware of the condition of the vessel, including the fact that there were points on the vessel where rings could get hung up. Despite this knowledge and his full view of the operation, the captain continued to place tension on the net while the ring was hung up near the plaintiff. It was a direct result of the captain's actions that caused the ring to forcibly come loose, striking the plaintiff violently in the face. Thus, Omega is liable under the Jones Act for negligence.

5.

Comparative negligence may apply to decrease the amount of a plaintiff seaman's recovery on a Jones Act claim for negligence. *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 213 (5th Cir. 2006). "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." *Id.* "The standard of

care for a seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances." *Jackson*, 245 F.3d at 528; *Gautreaux*, 107 F.3d at 338-39.

Credible evidence supports the conclusion that the Plaintiff was not negligent. According to Captain Lawson Schools, the plaintiff did not cause or contribute to the accident. Moreover, "the failure of the shipowner to comply with its heavy obligation to select and furnish seaworthy appliances cannot be thus turned into a fault by the seaman." *Cox v. Esso Shipping Co.*, 247 F.2d 629, 636 (5th Cir.1957). Not only is there no evidence that the plaintiff caused or contributed to the accident, but the testimony of the captain indicates just the opposite. The captain testified that the plaintiff was where he should have been and was properly performing his job duties at the time of the accident. Therefore, the plaintiff is not comparatively at fault for this accident.

6.

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. 1 SCHOENBAUM, ADMIRALTY AND MARITIME LAW §5-15 (4th ed).

7.

The evidence supports the conclusion that the Plaintiff has an after-tax past loss of earnings of $37,801.00 and future loss of earnings (after commuting to present value) of $226,196.00 .

8.

The defendants have paid only a small fraction of the plaintiff's past medical bills. The evidence supports the plaintiff's claim for $25,000.00 in past medical expenses. Regarding

future medical expenses, the cervical surgery and post-surgery care are estimated to cost $75,000.00. The Court finds that an award of $25,000.00 for past medical expenses and $75,000.00 for future medical expenses is appropriate.

9.

Damages for pain and suffering may be awarded to a seaman who is injured due to the unseaworthiness of the vessel. *Sosa v. M/V Logo Izabal*, 736 F.2d 1028, 1034 (5th Cir. 1984); 1 SCHOENBAUM, ADMIRLTY AND MARITIME LAW §6-18 (4th ed.). The plaintiff has suffered multiple serious injuries. He suffered a severe facial fracture that required surgery. According to both Dr. Barry and Dr. Henderson, the plaintiff will require a second facial and sinus surgery. In addition, the plaintiff also suffered a closed head injury. He experiences constant headaches nearly every day, for which he has been receiving treatment since the date of the accident. The injury has impaired his ability to breathe normally, and there is evidence of cognitive impairment resulting from the head trauma, with symptoms of blurred vision and impaired memory. The plaintiff will likely continue to suffer from a significant amount of pain directly related to this incident for some time, if not for the rest of his life. He will also have permanent scarring from the injury to his face. In addition, the plaintiff also suffered an aggravation of his pre-existing cervical condition that will require a two-level anterior cervical fusion and discectomy to allay his present symptoms. The Court finds that this treatment is causally related to the accident. Indeed, all of the treatment the plaintiff is currently receiving and plans to pursue is related to the accident and is uncontroverted.

Accordingly, the Court finds that the plaintiff is entitled to an award of $300,000 for past pain and suffering and $400,000 for future pain and suffering. *Broussard v. Stolt Offshore, Inc.*, No. 04-2471, 2007 WL 101041 (E.D. La. Jan. 9, 2007) ($400,000 awarded for pain and suffering

to plaintiff who injured back while moving fuel transfer hose, aggravating prior asymptomatic spondylolisthesis, and resulting in degenerative arthritis with bulging discs, nerve root displacement, residual pain, and impaired mobility); *Androutsakos v. M/V Psara*, No. 02-1173-KI, 2004 WL 1588224 (D. Or. July 13, 2004) ($3,000,000 awarded for pain and suffering to plaintiff struck by mooring line across face and head, resulting in considerable head trauma and residual brain damage with impaired memory and limited mobility); *Grayson v. R.V. Ammon and Associates, Inc.*, 99-2597 (La. App. 1 Cir. 11/3/00); 778 So. 2d 1 ($500,000 awarded for pain and suffering to plaintiff for skull fracture with outward radiating fractures surgery, adjustment disorder, and cervical disc rupture); *Darbone v. State*, 01-1196 (La. App. 3 Cir. 2/6/02); 815 So. 2d 943 ($800,000 awarded to plaintiff for fractured skull with cognitive impairment, two scar revisions, and other permanent scarring); *McMahon v. Regional Transit Authority*, 96-1770 (La. App. 4 Cir. 12/10/97); 704 So. 2d 392 (reversing trial court's award of $150,000 for pain and suffering and holding that $500,000 was lowest reasonable award of pain and suffering for plaintiff with skull fracture, closed head injury, and post-concussion syndrome, resulting in impaired memory with residual pain and post-traumatic headaches).

10.

A seaman injured in the course of his or her employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (*e.g.*, recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1013 (5th Cir. 1994). Thus, whether the seaman or the employer was negligent is not at issue in determining maintenance. *Brister v. AWI, Inc.*, 946 F.2d 350, 360 (5th Cir. 1991); *Jauch*, 470 F.3d at 212. Maintenance is the seaman's right to food and lodging, whereas cure is

the seaman's right to necessary and appropriate medical services. Both rights extend to the point at which the seaman reaches maximum medical improvement (MMI). *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962)). The maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir.1996).

11.

The seaman's claim for maintenance and cure lies against the seaman's employer, which, in this case, is the defendant Omega. *See Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir. Unit A 1981). If a seaman's employer willfully and arbitrarily fails to pay maintenance and cure, the seaman may recover attorney's fees but not punitive damages. *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1513 (5th Cir. 1995); *see also Vaughan*, 369 U.S. at 530-31; *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 177 (5th Cir. 2005). In order to recover for a claim of maintenance and cure and attorney's fees, the plaintiff bears the burden of proving (1) that he was injured in the course of his employment aboard the vessel; (2) that the employer failed to pay maintenance and cure; and (3) that the employer's failure was willful and arbitrary. *See Guevara*, 59 F.3d at 1513; *see also* 1 SCHOENBAUM, ADMIRALTY AND MARITIME LAW §6-34 (4th ed.).

12.

The credible evidence supports the conclusion that the Plaintiff sustained multiple injuries on July 2, 2007, while working aboard the F/V COTE BLANCHE BAY, and that he was unfit for duty as a result of this injury from the date of the accident to the present. He will need two additional surgeries and, due to his cognitive deficits, will not be able to work in the future.

13.

In order to recover maintenance, the seaman plaintiff must produce "evidence to the court that is sufficient to provide an evidentiary basis for the Court to estimate his actual costs." *Hall v. Noble Drilling (U.S.), Inc.*, 242 F.3d 582, 590 (5th Cir. 2001). Provided he has incurred the expense, the seaman is entitled to the reasonable cost of food and lodging. Lodging encompasses those expenses "necessary to the provision of habitable housing," including heat, electricity, home insurance, and real estate taxes. *Hall*, 242 F.3d at 587 n.17 (citing *Gillikin v. United States*, 764 F. Supp. 270,273 (E.D.N.Y.1991)). The plaintiff testified that his monthly bills were as follows: Rent-$425.00; Food-$300.00; Electricity-$158.00; Water-$98.00; Gas-$88.00. Furthermore, Mr. David Ott of Omega testified that Omega had paid $20.00 per day to the plaintiff through October 31, 2007, when it discontinued maintenance benefits.

The Court finds that maintenance at the rate of $35.00 per day is fair and reasonable and that the plaintiff is entitled to receive payment in this amount from the date of his injury until February 19, 2009, the date of trial, with credit for amounts paid by defendant.

14.

The defendants were presented with overwhelming and uncontroverted medical evidence to support the plaintiff's claims of facial injuries, scarring, headaches, and cognitive deficits. The testimony of Dr. Barry, an ENT, Dr. Shamieh, a neurologist, Dr. Dilks, a neuropsychologist, and Dr. Henderson, a plastic surgeon, were all uncontroverted. The testimony of Dr. Bernauer and Dr. Gunderson were also uncontroverted. The defendant knew that the plaintiff had been seriously injured. The defendant paid maintenance and a portion of the plaintiff's medical bills, but soon thereafter terminated the plaintiff without any justifiable reason. The defendant alleges that the reason the plaintiff's maintenance and cure was terminated was because the defendant

did not receive medical reports and did not know that the plaintiff was still under treatment. The defendant's position, however, is not supported by the evidence. There is evidence that several of the doctors requested payment from the defendant, to no avail. There is also evidence that the plaintiff's attorneys made several demands for maintenance, again to no avail. In fact, it was only approximately one month before trial when the defendant belatedly requested an examination by Dr. Bertuccini. Even then, Dr. Bertuccini did not opine that the plaintiff did not need surgery or that the plaintiff had recovered to the extent that he was employable. Still, however, no maintenance was forthcoming.

The defendant's decision to not pay the medical bills of these providers under the cure obligation or to reinstate maintenance rises to the level of willful callousness or an egregious fault required for the defendant to be considered liable for attorney's fees. Accordingly, the Court awards the plaintiff's attorney's fees for failure to pay maintenance and cure in an amount of $15,000.00.

## IV. PRE-JUDGMENT INTEREST

Pre-judgment interest may be awarded in admiralty cases for past losses if appropriate, and the court finds that an order of pre-judgment interest is appropriate in this case. "Prejudgment interest is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Jauch*, 470 F.3d at 214-15. However, pre-judgment interest on future damages is not available. *Id.* The starting date and rate of interest is left to the sound discretion of the Court. *See Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 593 (5th Cir.1986), *reh'g denied*, 811 F.2d 602 (1987); *Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 340 (5th Cir.1972).

The Court finds that an award of pre-judgment interest in the amount of 5.5% is warranted based on the plaintiff's past medical bills, past wages, and past pain and suffering from the date of the accident until paid.

## V. CONCLUSION

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that the plaintiff sustained damages due to the defendant's negligence and the unseaworthiness of the vessel, and the plaintiff is entitled to payment for maintenance and cure. The defendants are also liable for attorney's fees for willful denial of maintenance and cure. Accordingly, the plaintiff is entitled to recover the following damages from the defendants:

(1) Past wage loss: $37,801.00;

(2) Future wage loss: $226,196.00;

(3) Past medical expenses: $25,000.00;

(4) Future medical expenses: $75,000.00;

(5) Past pain and suffering: $300,000.00;

(6) Future pain and suffering: $400,000.00;

(7) Maintenance: $35.00 per day from date of injury until February 19, 2009, the date of trial, with credit for amounts paid by the defendant;

(8) Attorney's fees: $15,000.00

Additionally, the plaintiff is entitled to pre-judgment interest in the amount of 5.5% on the above-mentioned past losses, totaling $362,801, from the date of the accident until satisfied. Furthermore, the plaintiff is entitled to post-judgment interest at the judicial interest rate from the date of judgment until paid on his future losses, totaling $701,196, plus outstanding maintenance

payments and attorney's fees.

New Orleans, Louisiana, this __28th__ day of April, 2009.

_____
UNITED STATES DISTRICT JUDGE